

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-8-1999

# USA v. Dispoz O Plastics

Precedential or Non-Precedential:

Docket 98-1135,98-1136

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Dispoz O Plastics" (1999). *1999 Decisions.* Paper 92.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/92

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 8, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-1135 and 98-1136

UNITED STATES OF AMERICA

v.

DISPOZ-O-PLASTICS, INC.,

  Appellant in No. 98-1135

and

PETER IACOVELLI,

  Appellant in No. 98-1136

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action Nos. 96-cr-00280-2 and 4)
District Judge: Honorable Anita B. Brody

Argued September 14, 1998

Before: STAPLETON and ROTH, Circuit Judges
LONGOBARDI,[1] District Judge

(Opinion filed: April 8, 1999)

_____

1. Honorable Joseph J. Longobardi, United States District Court Judge
for the District of Delaware, sitting by designation.

Joel I. Klein
Assistant Attorney General
A. Douglas Melamed
Deputy Assistant Attorney General
John J. Powers, III, Esq.
Robert B. Nicholson, Esq.
John P. Fonte, Esq. (Argued)
Antitrust Division
U.S. Department of Justice
601 D. Street, N.W.
Washington, D.C. 20530

Scott D. Hammond, Esq.
Antitrust Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

   Attorneys for Appellee

Theodore B. Olson, Esq. (Argued)
Miguel A. Estrada, Esq.
Jacqueline E. Coleman, Esq.
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

   Attorneys for Appellants

OPINION OF THE COURT

ROTH, Circuit Judge.

Peter Iacovelli and his company, Dispoz-O-Plastics, Inc. ("Dispoz-O"), appeal from a judgment of conviction entered in the United States District Court for the Eastern District of Pennsylvania. Iacovelli and Dispoz-O were convicted of conspiracy to fix prices in the plastic cutlery industry in violation of 15 U.S.C. S 1. Their claims on appeal include the following: (1) that the District Court erred in admitting evidence that government witnesses had been convicted of

2

conspiracy to fix prices with Dispoz-O, (2) that the District Court erred in determining that the government's vouching for its witnesses by referring to extra-record prosecutorial policy constituted harmless error, and (3) that the District Court failed to declare a mistrial on the grounds that the government vouched for its witnesses by saying they had no motive to lie about whether they conspired to fix prices.[2] We will affirm the judgment of the District Court regarding appellants' first and third claims, the admissibility of the co-conspirators' convictions and the prosecutor's comments regarding the government's witnesses' motives to lie. However, we find that the prosecutor's extra-record comment about prosecutorial policy constitutes reversible error. We will therefore reverse the judgment of the District Court and remand this case for a new trial.

I. FACTS

Dispoz-O is an American manufacturer of disposable plastic cutlery, including knives, forks, and spoons. Peter Iacovelli is Dispoz-O's president, CEO, and sole stockholder. One type of plastic cutlery that Dispoz-O manufactures is medium-weight polypropylene cutlery, a popular flexible type of cutlery that is less expensive than stiffer polystyrene cutlery. Two of Dispoz-O's competitors in the medium-weight polypropylene cutlery ("plastic cutlery") industry are Amcel Corp. ("Amcel"), headed by Lloyd Gordon,[3] and Polar Plastics Manufacturing, Ltd. ("Polar"), headed by Andrew Liebmann and Basem Atallah.

_____

2. We have considered the remaining contentions raised by Iacovelli and Dispoz-O and conclude that the District Court's treatment of them did not amount to reversible error. These remaining claims are that the government used first-person pronouns in its opening and closing statements to describe itself as a protagonist in the investigative process and to present its beliefs and conclusions to the jury, and that in its closing statement the government impermissibly commented on Iacovelli's failure to testify and it referred to FBI equipment used to investigate telephone numbers that was not introduced at trial.

3. Iacovelli and Dispoz-O were tried jointly with co-defendants Amcel and Lloyd. All defendants were convicted of conspiracy to fix prices. Only Iacovelli and Dispoz-O appeal.

Dispoz-O, Iacovelli, Amcel, and Gordon were charged with conspiracy to fix prices in the plastic cutlery industry. The charges centered on a meeting held at a restaurant at LaGuardia Airport in November 1991. Prior to the meeting, in October 1990 and May 1991, Gordon had sent copies of Amcel's recent price increases to Dispoz-O and Polar. In October 1991, Gordon met privately at a trade show with Liebmann and Atallah and later with Iacovelli and Albert Postrel, Dispoz-O's sales representative, to convince them to follow each other in making price increases. At that time, Iacovelli requested a meeting with representatives of Amcel and Polar to discuss pricing. He also contacted Michael Kennedy, head of the parent corporation of another plastic cutlery competitor, Winkler Products, to discuss "get[ting] a price increase." Kennedy declined to discuss pricing with Iacovelli.

The meeting at LaGuardia Airport was attended by Gordon, Iacovelli, Liebmann, and Atallah. According to the testimony of Liebmann and Atallah, Iacovelli outlined then-existing costs, and the group agreed that prices were too low. Atallah suggested that the group set a price minimum under which they would not go in order to prevent customers from playing the manufacturers against each other. Price increases in the industry were usually set as percentages because customers had varying deals with the manufacturers and often received prices that were discounted from standard price ranges. However, the LaGuardia group agreed to fix truckload prices at specific levels: $4.75 per case for forks, spoons, and knives, $5.00 for soup spoons, and $5.25 for combination fork/spoon ("spork") cutlery; they resolved not to offer discounts below those levels.

Atallah said that another competitor, Jet Plastica, should be asked to join the agreement if it was to be successful. Gordon agreed to approach Jet Plastica's principal about the plan. Atallah volunteered to increase its prices first and then send copies of its letter notifying customers of the price increases to Gordon and Iacovelli. During the meeting, Iacovelli told Liebmann and Atallah to refrain from taking notes and to pay for meeting expenses with cash to avoid creating any record of the meeting.

4

After the meeting, Atallah drafted the letter and an explanatory memo for his sales force. He instructed his secretary that, before she disseminated the letter to customers, she should fax copies of the letter to Amcel and Dispoz-O without the "Polar" fax banner. A few days later, Gordon faxed a signed price letter with identical increases to Polar and Dispoz-O; although sent by Gordon, these faxes bore the fax banner of an unrelated company, M.B. Financial. Later that day, Dispoz-O issued an increase letter listing the same prices. Unlike Amcel's and Polar's letters, however, Dispoz-O's letter did not announce the prices as a "floor" below which no discounts would be granted. Moreover, Dispoz-O did not adhere to such a "floor" after its letter was sent out; in fact, it did still discount or rebate some of its sales, although not as extensively as before.

Iacovelli set the price increases without Postrel's customary input. He assured Postrel that the increase would "stick," as Gordon also assured one of his sales managers. The price increases "stuck" from January 1992 to early March 1992, when Atallah notified Iacovelli and Gordon that he was going to lower Polar's prices. Although Iacovelli and Gordon tried to dissuade him, Atallah refused to continue with the agreement because he claimed to be losing too much business to Jet Plastica, which had not joined the agreement.

Later, the FBI questioned Iacovelli and Gordon, who lied about their contacts with competitors. Iacovelli denied that he had ever discussed prices with competitors, either in meetings or on the telephone, and he claimed that he had never received pricing information from a competitor by fax. Subsequently, Gordon contacted Iacovelli and Atallah to arrange a cover-up.

The government indicted Dispoz-O, Iacovelli, Amcel, and Gordon for conspiracy to fix prices. At trial, the government's two main witnesses were Liebmann and Atallah. These two had previously pled guilty to conspiracy to fix prices in the plastic cutlery industry and to an unrelated conspiracy to fix prices in the plastic cups industry. The testimony of Liebmann and Atallah was crucial to the government's case because the primary issue

5

at trial was whether Liebmann, Atallah, Gordon, and Iacovelli had reached an agreement to fix prices. The government's documentary evidence revealed only general information such as the timing and frequency of telephone calls among the parties and the fact that the parties had faxed their price letters to each other. Liebmann and Atallah's testimony was necessary to establish the subject matter of the discussion at LaGuardia, as well as of the other communications between the parties, and thereby to demonstrate that the competitors were conspiring tofix prices.

The theory of the defense was that the LaGuardia meeting and the other communications related to merger and joint-venture discussions rather than to illegal price-fixing. The defense presented evidence of merger and joint-venture discussions between industry manufacturers during that time, as well as introducing planning documents which analyzed Dispoz-O as a potential partner for Amcel. The defense also produced evidence that communications between manufacturers about their pricing was advisable, given customers' attempts to play the manufacturers against each other. Because the topic of conversation at the LaGuardia meeting was so vital to both sides, the credibility of Liebmann and Atallah was key.

At the close of the trial, the prosecutor argued during summation:

> Now, first with regard to the sweetheart deal. You heard the testimony of Liebmann and Atallah, you can decide whether or not you think they felt that was a sweetheart deal. They went to jail and they pled guilty to both counts.
>
> Common sense tells you people don't confess to a crime, they don't turn a completely innocent, legitimate business meeting into a crime, they don't confess to crimes they didn't commit and that's what the defendants are trying to tell you they did.
>
> Now obviously they got credit for their cooperation; that's the way it works. But that misses the point. Why would Liebmann and Atallah say they fixed prices at LaGuardia? Why would they tell that to the

6

Government, who would they tell that to the judge who sentenced them? Why would they tell that to their customers, their customers, if it didn't happen? Think about that.

They told the Government they fixed prices twice and I can guarantee you the Justice Department doesn't give two for one deals; they had to plead guilty to both price fixing conspiracies and their sentence reflected that.

On the basis of these remarks, the defendants moved for a mistrial. The court held a hearing and issued an opinion denying defendants' motion. The court determined that the prosecutor's reference to the guilty pleas of Liebmann and Atallah was made in response to defendants' argument that the witnesses' guilty pleas provided a motive for them to lie. The court gave two curative instructions to the jury, explaining how the pleas could and could not be used.

In its post-trial Order and Explanation, the District Court concluded that, even if the prosecutor's comments had been improper, they constituted harmless error because of the overwhelming evidence of defendants' guilt. The court further found that the prosecutor's comment that the witnesses were sentenced for "two price fixing conspiracies" was not extra-record vouching because of testimony at trial that the witnesses had pled guilty and were sentenced for two crimes. The court also found the prosecutor's reference to a purported government policy against offering"two-for-one" deals to constitute vouching. However, it deemed the "conspiracies" and "two-for-one" comments to be harmless error in light of the context of the trial and the overwhelming evidence against defendants.

The District Court had jurisdiction over this action pursuant to 18 U.S.C. S 3231 and 15 U.S.C.S 1. See United States v. Gaev, 24 F.3d 473, 474 n.1 (3d Cir. 1994). Dispoz-O filed a timely appeal. We have jurisdiction pursuant to 28 U.S.C. S 1291.

II. DISCUSSION

A. The Guilty Pleas

The first issue we will consider is whether the District Court erred in admitting the co-conspirators' guilty pleas. The government contends that Dispoz-O and Iacovelli waived their objections to the admissibility of the pleas.

Our standard of review of a trial court's decision to admit evidence of a co-conspirator's convictions is for abuse of discretion. United States v. Universal Rehabilitation Services, No. 97-1412, 1999 WL 62512, at *9 (3d Cir. Feb. 11, 1999); Gaev, 24 F.3d at 476; Bruno v. W.B. Saunders Co., 882 F.2d 760, 766 (3d Cir. 1989).

Dispoz-O and Iacovelli moved in limine to exclude evidence of the guilty pleas as unduly prejudicial, arguing that the crime necessarily involved more than one participant and that the defendants and the witnesses had been charged with the same conspiracy.4  The government countered that the cutlery plea evidence should be admitted to explain the witnesses' motivation to testify and the circumstances surrounding their appearances in court. Defense counsel offered not to attack the witnesses' credibility on the claim that Liebmann and Atallah were given leniency by being allowed to avoid charges on the cutlery conspiracy. Counsel further offered not to argue to the jury that the witnesses got a "sweetheart deal because the Government let them slide on cutlery." The government countered that the jury would nevertheless be left with the misleading impression that the witnesses received leniency on the cutlery charge. The court asked defense counsel if he would be willing to avoid admission of evidence of both the cups and cutlery pleas. He answered, "That's not going to happen, judge."

Regarding the cutlery pleas, defense counsel conceded, "[T]his whole problem is because it's a conspiracy. If it wasn't a conspiracy, it wouldn't be a problem. If there was
_____

4. In their pre-trial brief, defendants specifically noted that they did not object to the introduction of the witnesses' guilty pleas to conspiracy in the plastic cups industry.

8

a substantive offense of price fixing and these guys pled guilty to price fixing, I wouldn't care about it, but it's because it takes two to tango, and there's them and there's us." The judge asked, "Could we carve something out that would deal with this somewhat, to say instead of that they pled guilty to conspiracy, that they pled guilty to price fixing in these two areas?" Defense counsel replied, "That would be very helpful. That would deal with a major problem." Noting that removal of the word "conspiracy" from the price-fixing pleas sounded "reasonable," the judge nevertheless stated, "I'm not ruling on that." The judge again asked defense counsel if removal of "conspiracy" would suffice: "That will be eliminated. All right. The present status of that, does that have you satisfied . . .?" Counsel replied, "It does, yes."

The plea agreements were then redacted to eliminate the term "conspiracy" and read simply that Liebmann and Atallah would plead guilty to fixing the price of plastic cutlery and cups. The redacted plea agreements were admitted into evidence without objection. Although the court's subsequent written order stated that the motion in limine was granted in part and denied in part, the order also stated that the disposition of the motion was "as stated on the record of July 3, 1997."

Defense counsel in fact did use the term "conspiracy" on several occasions during his cross-examination of Liebmann and Atallah. Then, at the outset of his closing argument, the prosecutor for the first time used the word "conspiracy," stating that Liebmann and Atallah had pled guilty "to both price fixing conspiracies." When the argument was completed and the jury had left the courtroom, defense counsel moved for a mistrial, asserting that the court had "ruled out" admission of evidence regarding pleading guilty to two conspiracies. The judge replied, "I didn't rule it out, it's what you both agreed to." Defense counsel acknowledged, "Yes."

A waiver is the "intentional relinquishment or abandonment of a known right." United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); see United States v. Goldberg, 67 F.3d 1092, 1099 (3d Cir. 1995), quoting Johnson v. Zerbst, 304 U.S. 458,

9

464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Once waived, a claim is not preserved for appellate review. See Olano, 507 U.S. at 733-734; United States v. Yu-Leung, 51 F.3d 1116, 1120 (2d Cir. 1995), aff 'd sub nom. Ruotolo v. United States, 133 F.3d 907 (2d Cir.), cert. denied , 118 S.Ct. 1852, 140 L.Ed.2d 1101 (1998); see also United States v. Lakich, 23 F.3d 1203, 1207 (7th Cir. 1994) (relying on Olano); United States v. Gomez, 67 F.3d 1515, 1520 (10th Cir. 1995) (citing Olano and Lakich). Where a claim has not been definitively ruled upon, a moving party must object during trial to preserve that claim for appellate review. Bruno, 882 F.2d at 767-68; accord Walden v. Georgia-Pacific Corp., 126 F.3d 506, 517-19 (3d Cir. 1997); cert. denied, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998); American Home Assurance Co. v. Sunshine Supermarket, Inc., 753 F.2d 321, 324-25 (3d Cir. 1985).

At trial, when the government presented the redacted guilty pleas, Iacovelli and Dispoz-O did not object. Under the facts as presented, we conclude that no definitive pretrial ruling was made on the admissibility of the pleas and that the failure of defense counsel to object to their admission resulted in a waiver of the issue. To the extent that defense counsel objected to the one-time use of the term "conspiracy" by the prosecutor during his summation, that one objection does not appear to be directed at the admission into evidence of the redacted plea agreements. Moreover, the next morning the court gave a curative instruction to explain to the jury the purpose for which the pleas could be considered:

> [B]y stipulation of the parties it was agreed before the trial that Andrew Liebmann and Basem Atallah had pled guilty to fixing prices of plastic cutlery and not to a conspiracy to fix prices. As I will instruct you later in the charge, you are not to draw an inference of the guilt of any of the defendants in this case from the fact that other people have pled guilty to similar charges.

In this appeal, Iacovelli and Dispoz-O, in their opening brief, set out in the Statement of Issues as thefirst one: "Whether reversal of appellants' convictions is required because the district court erroneously admitted evidence that other individuals already had been convicted as a

10

result of the events for which appellants were on trial?" The appellants then stated that this issue "was raised before trial by motion in limine, (JA 30), and was argued and ruled upon at a conference held on July 3, 1997, just before the trial began." Iacovelli and Dispoz-O are bound by this description of the issue. Consequently, we conclude that the issue of the admissibility of the convictions and of the pleas leading to them was not preserved for appellate review.

B. Vouching

Dispoz-O's next claim is that the prosecutor vouched for Liebmann and Atallah during closing argument and that the district court erred in not granting a mistrial. We "review a district court's decision not to grant a mistrial on the grounds that the prosecutor made improper remarks in closing argument for abuse of discretion." United States v. Molina-Guevara, 96 F.3d 698, 703 (3d Cir. 1996).

There are two instances of vouching in the prosecutor's closing statement. The one we will review first is the prosecutors' comment on a purported plea policy of the Department of Justice. We find it to have been improper, and, because we find it was not harmless error, it warrants reversal. We conclude, however, that the second set of remarks, which addressed the witnesses' testimony about the LaGuardia meeting, was within the permissible bounds of advocacy.

"Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury." United States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998). Vouching is distinguishable from a personal opinion based on the evidence presented at the trial. United States v. DiLoreto, 888 F.2d 996, 999 (3d Cir. 1989), overruled on other grounds, United States v. Zehrbach, 47 F.3d 1252 (3d Cir. 1995) (en banc).

A prosecutor may not try to buttress his case by vouching for the credibility of a government witness. Molina-Guevara, 96 F.3d at 704. As we noted in Molina-Guevara, the Supreme Court discussed the dangers of

11

vouching in United States v. Young, 470 U.S. 1, 18–19, 15 S.Ct. 1038, 84 L.Ed.2d 1 (1985). The Court stated the following:

843<!>The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

Id.

During the closing, the prosecutor commented on a purported policy of the Department of Justice. The prosecutor stated, "They told the Government they fixed prices twice and I can guarantee you the Justice Department doesn't give two for one deals; they had to plead guilty to both price-fixing conspiracies and their sentence reflected that."5

We ruled that comments similar to that of the prosecutor here were improper vouching in United States v. DiLoreto, 888 F.2d 996 (3d Cir. 1989), a case involving conspiracy to distribute narcotics. The government witnesses were drug dealers who had entered into plea bargains. The defense attorneys strongly attacked the credibility and bias of the witnesses by arguing that the witnesses were testifying only because of "their own benefits, by their own interests, by their own motives" relating to their deals with the government. Id. at 998. During closing rebuttal, the prosecutor stated in part:

_____

5. As discussed above, we conclude that Iacovelli and Dispoz-O waived their objections to the admission of evidence of the witnesses' guilty pleas. For that reason, the discussion in this section concerns only the reference in the government's remarks to the plea bargain policy of the Department of Justice.

12

> And you also heard that they have a plea bargain, and you heard what happened when that plea bargain is not fulfilled. If they lie, that bargain is off. That's it, no bargain. We don't take liars. We don't put liars on the stand. We don't do that.

Id. (emphasis added).

On appeal, we reversed,[6] stating:

> By this language in his closing rebuttal statement, the prosecutor asserted to the jury that the government does not use liars as witnesses in its cases. . . . No explanation was given, however, of how the government ascertains the honesty or veracity of its witnesses. Indeed, we have found nothing in the record upon which the prosecutor could have grounded his statement. There must then have been some other evidence, unknown or unavailable to the jury, which convinced the prosecutor that his witnesses were not liars. Obviously, the defendants were not confronted with this extraneous evidence and afforded cross-examination, nor was the jury given an opportunity to engage in its own evaluation. What the jury was led to do instead was merely to infer that other information existed, which the government used to verify the credibility of its witnesses prior to introducing their testimonies at trial.

Id. at 999.

Here, the prosecutor similarly tried to buttress the credibility of cooperating witnesses by providing extra-record information. His remark about the purported policy of the Department of Justice not to give "two-for-one deals" was meant to convince the jury that the prosecutor knew that the witnesses were telling the truth -- that the department would not give a deal in return for the two guilty pleas unless it was convinced that there were two

_____

6. In DiLoreto, we used a per se rule to determine whether reversal was required. 888 F.2d at 999. We overruled DiLoreto 's per se rule in our en banc decision in United States v. Zehrbach, 47 F.3d 1252, 1267 (3d Cir. 1995). However, we did not overrule the result reached in DiLoreto, reversing the convictions. Zehrbach, 47 F.3d at 1255 n.1.

13

price fixing offenses and that Liebmann and Atallah were criminally involved in both of them. The jury was led to infer that the government had information with which they were able to confirm that Liebmann and Atallah were truthful in their recitations of their involvement and also that of the other "conspirators," i.e., Iacovelli, Dispoz-O, Gordon, and Amcel. The inference was, therefore, that the department had verified the existence of both conspiracies, but there was no explanation of how the department had made this verification.[7] Without such an explanation, Iacovelli and Dispoz-O were deprived of the chance to cross-examine. Moreover, the jury may have been persuaded by this language to find that the witnesses' statements implicating Iacovelli and Dispoz-O were accurate and, thus, that Iacovelli and Dispoz-O were guilty. See DiLoreto, 888 F.2d at 1000. For this reason, the prosecutor's extra-record remark constituted vouching.

Even if a prosecutor is found to have vouched for a government witness, however, the government may defensively invoke the "invited response" doctrine in an

_____

7. Judge Stapleton considers it unlikely that a juror would infer from the government's reference to a policy against two-for-one deals that the Justice Department "had verified the existence of both conspiracies." He nevertheless concludes that this reference provides impermissible support for the veracity of Liebmann and Atallah and that this prosecutorial misconduct was not harmless.

In Judge Stapleton's view the defense properly argued to the jury that Liebmann and Atallah decided to perjure themselves about (and plead guilty to) a non-existent plastic cutlery conspiracy because they expected that, as a result of doing so, they would receive less punishment than they would receive if they confessed only to the plastic cup conspiracy (i.e., a sweetheart deal). The prosecutor's reference to a policy against two-for-one deals was tendered in an attempt to counter this argument. This reference was intended to suggest that, when Liebmann and Atallah confessed to the FBI participation in a second conspiracy, they were speaking against their own interests because they knew that, under Justice Department policy, a second confession would necessarily lead to a second indictment and two sentences based on the two crimes. There was no record evidence, however, from which a juror could conclude that a policy against two-for-one deals existed, or, accordingly, that it played a role in the decisions of Liebmann and Atallah to confess to the second conspiracy.

14

attempt to prevent reversal. The invited response doctrine covers comments made in "reasonable response to improper attacks by defense counsel." Walker, 155 F.3d at 186 n.5, quoting United States v. Pungitore, 910 F.2d 1084, 1126 (3d Cir. 1990); United States v. Pelullo, 964 F.2d 193, 218 (3d Cir. 1992). The doctrine's rationale is that "the unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial." Walker, 155 F.3d at 186 n.5 (quoting Pungitore, 910 F.2d at 1126). A prosecutor may use the doctrine defensively, but not offensively, as a "springboard" launching affirmative attacks upon defendants. Id.; Pelullo , 964 F.2d at 218.

The government claims that its "guarantee" was in proper response to specific comments of defense counsel in opening and closing arguments about the "sweetheart deal" that the witnesses landed in the plastic cups case by inventing the price fixing in cutlery. Defense counsel asserted that, in order to get shorter sentences than the ones they were already facing for the plastic cups conspiracy, Liebmann and Atallah lied by telling the government that defendants were involved in a cutlery conspiracy. Counsel did not accuse the prosecution of participating in the alleged lie. Rather, defense counsel asserted that the witnesses confirmed the suspicions which the prosecution had about price fixing of cutlery, based on the fact that telephone calls had been made and that the meeting at LaGuardia had been held. Referring to the witnesses' alleged fabrications, counsel stated,"Does that mean that these prosecutors are coming in here and selling a lie? No, it doesn't."

Unless the defense had made direct attacks on the prosecution or on other law enforcement officials, we cannot say that the prosecutor's comment about the Justice Department's purported plea bargaining policy was permissible under the invited response doctrine. We have generally found the invited response doctrine to be applicable only in instances where the prosecution team was attacked for reasons unsupported by the evidence at trial. See United States v. Gambino, 926 F.2d 1355, 1364–66 (3d Cir. 1991) (comments including assertion that government suborned perjury); United States v. Pungitore,

15

910 F.2d 1084, 1127 (3d Cir. 1990) (personal attacks on integrity of prosecutors and law enforcement officers); see also Pelullo, 964 F.2d at 217–18 (comment that government suborned perjury); United States v. Curtis, 683 F.2d 769, 778 (3d Cir. 1982) (comment that government avoided questioning witness about entrapment allegations); cf. Young, 470 U.S. at 9 ("Defense counsel, like his adversary, must not be permitted to make unfounded and inflammatory attacks on the opposing advocate.").8

Moreover, we have distinguished between an attack on the testimony given by a government agent and a situation where the prosecution is accused of putting on a case which it knew was false. In the former situation, we found the invited response doctrine to be inapplicable. See Molina–Guevara, 96 F.3d at 705. In Molina–Guevara , defense counsel attacked the credibility of a government agent who testified. The defense urged the jury to consider that the agent –– whose "frustrating" job it was to catch criminals who sometimes "g[o]t away" –– was"human" and may have "erred," "stretched," or even "lied" when testifying about the drug bust at issue. Id. at 701–02. In turn, the prosecutor vouched for the agent by saying that it would be"insulting" and "ridiculous" for the jury to assume that the United States would present a witness who would lie and that the agent "did not lie to you." Id. at 704.9 We determined that the government's statements were not excused under the invited response doctrine because defense counsel's comments fell within the bounds of "vigorous advocacy entirely appropriate for a case that turned on the jury's assessment of the credibility of the witnesses." Id. at 705.

_____

8. The government cites the Second Circuit's decision in United States v. Eltayib, 88 F.3d 157, 173 (2d Cir. 1996) to support its argument that it properly responded to defense counsel's attacks that"impugned the integrity of [its] case." Unlike the instant case, however, the defense in Eltayib directly attacked the prosecution, asserting that it had fabricated
an informant's testimony. Id.

9. The prosecution also argued that another agent, if called as a witness, would have corroborated the testifying agent's story. The case was reversed because we found that comment to be violative of the Confrontation Clause of the Sixth Amendment. Molina–Guevara, 96 F.3d at 702–03.

16

Here, defense counsel did not directly attack the prosecution. Although defense counsel attacked the witnesses' credibility based on their possible motivation to plead guilty and to testify, defense counsel did not suggest, for instance, that the prosecutor was suborning perjury. Consequently, the prosecution's comment did not qualify as an invited response.

Because we find that the invited response doctrine is not applicable, we must next evaluate the vouching to determine whether it constituted harmless error. Zehrbach, 47 F.3d at 1264. This Court en banc has held that vouching that is aimed at the witness's credibility and is based on extra-record evidence is deemed non-constitutional error. Id. at 1265.10

Non-constitutional error is considered harmless when "it is highly probable that the error did not contribute to the

_____

10. Iacovelli and Dispoz-O cite a recent Supreme Court case, Gray v. Maryland, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), to support their proposition that the prosecutor's vouching here is constitutional error, violating the Sixth Amendment. They claim that Gray overruled Zehrbach. However, the language in Gray does not extend to prosecutorial vouching. In Gray, the Supreme Court extended its ruling in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Bruton was found guilty after the confession of a non-testifying co-defendant was admitted at a joint trial. Because the confession named and incriminated Bruton, the Court found that its admission violated Bruton's Sixth Amendment rights despite a limiting instruction to the jury that the confession should only be considered as evidence against the defendant who had confessed. Gray extended that protection to a defendant faced with the admission of such a confession by a codefendant when the confession was redacted by substituting a blank space or the word "deleted" for the defendant's name. Gray, 118 S.Ct. at 1153. The decision in Gray focuses on "powerfully incriminating extrajudicial statements of a codefendant," id. at 1155 (quoting Richardson v. Marsh, 481 U.S. 200, 207 (1987)), which are "so prejudicial that limiting instructions cannot work." Id. Vouching, as a category of statements, does not necessarily rise to the same level of prejudice as does the type of redacted confession involved in Gray. In many instances of vouching, curative instructions do indeed neutralize the improper statement. See, e.g., Zehrbach, 47 F.3d at 1267. We conclude that our determination that vouching is non-constitutional error does not run afoul of Gray.

17

judgment." Id., quoting Government of Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir. 1976). "High probability" is found where the court has a "sure conviction that the error did not prejudice" the defendant. Zehrbach , 47 F.3d at 1265, quoting United States v. Jannoti, 729 F.2d 213, 219–20 (3d Cir.), cert. denied, 469 U.S. 880, 105 S.Ct. 243, 244, 83 L.Ed.2d 182 (1984). The test for determining prejudice is tripartite. The factors to be examined are the scope of the comments and their relationship to the proceeding, the extent of any curative instructions, and the strength of the evidence against defendants. Zehrbach, 47 F.3d at 1265.

Here, the prosecution depended on testimony from Liebmann and Atallah to establish that the discussions with defendants at the LaGuardia meeting were about price fixing. The prosecution claimed that the parties entered into an agreement to fix prices at LaGuardia. The defense argued and presented evidence that they were meeting for the permissible purpose of discussing a joint venture or merger. The credibility of Liebmann and Atallah was a crucial issue which both sides addressed during their closing arguments.

The "two-for-one" comment was made toward the end of the prosecutor's closing argument. Immediately after the prosecutor finished, the court excused the jury. Amcel's defense counsel then moved for a mistrial, primarily objecting to the prosecutor's reference to the witnesses' guilty pleas as involving a conspiracy. Iacovelli and Dispoz-O joined in Amcel's objections and objected specifically to the vouching comment. At this point, the judge only commented on the "conspiracy" reference -- resolving to address it during the jury charge and advising the prosecutors that they had a chance to cure any harm during their rebuttal, which was about to begin. Later, at the end of the government's rebuttal, the judge dismissed the jury until the next day, and defense counsel renewed its motion for a mistrial. The judge denied the motion, subject to revisiting it after trial if defendants were convicted. The next day, at the beginning of its charge to the jury, the judge specifically addressed the "conspiracy" issue, but not the "two-for-one" comment.

18

Although the law assumes that jurors follow the instructions they receive, Richardson v. Marsh , 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the circumstances surrounding the curative instructions are to be examined under the Zehrbach test. First, the instructions given here were not specifically directed to the statements of the prosecutor. Instead, the judge generally instructed the jury to evaluate the credibility of witnesses who pled guilty because they might be motivated to lie. The judge told the jury that an important way of determining whether the government had proved defendants guilty beyond a reasonable doubt was to evaluate the witnesses' testimony. The jury was not informed, however, that the prosecutor's statement about bargaining policy could not be considered as evidence. The instructions, thus, were not curative of the prosecutor's comment, see Government of Virgin Islands v. Mujahid, 990 F.2d 111, 116 (3d Cir. 1993), and we are not convinced that they adequately neutralized the harm caused by the prosecutor's reference to the government's policy in making "two-for-one" deals.

The final factor to be considered is the closeness of the case. During its closing, the prosecution made it clear that Liebmann's and Atallah's testimony was central to the strength of its case: "[Y]ou have heard from roughly 18 witnesses and seen hundreds of documents, but this case still comes down to that one issue: did the defendants secretly meet at LaGuardia, Andrew Liebmann and Basem Atallah, and agree to fix prices on cutlery or instead did they meet to discuss a three-way joint venture?" 11 Later, asserting that an agreement need not be reached in writing and could be established "by a wink of an eye," he stated, "And that is why the issue is what happened at LaGuardia because once the agreement is reached, the crime is complete." Then, after describing the LaGuardia meeting according to Liebmann's and Atallah's testimony, the prosecutor told the jury:

_____

11. The prosecutor went on to state that the phone records, faxes, and other documents "corroborate" the witnesses' testimony. The final component of his proof was evidence that establishing that Iacovelli lied to the FBI and testified falsely.

19

> That's the agreement. At that point in time the crime
> was committed, the crime was complete. Those
> defendants and Polar fixed prices, they are guilty of
> price fixing. Nothing else has to be shown in order to
> convict them of price fixing.
>
> Now, what happened afterwards is additional proof
> that they fixed prices. And you'll see, there is plenty
> more proof, but the agreement, the agreement was
> reached at LaGuardia.

The witnesses' testimony was clearly central to the government's case. Without it, the prosecution could not establish that there was an agreement to fix prices. The defense, recognizing that, endeavored to develop an alternative theory of the discussions and sharing of pricing information. We find the crucial nature of the witnesses' testimony to be an important factor in determining whether the prosecutor's remark was prejudicial. See Molina–Guevara, 96 F.3d at 705. When we consider the significance of Liebmann and Atallah's credibility and compare that to the general nature of the court's instructions, we are not left with the "sure conviction that the error did not prejudice the defendant," Zehrbach, 47 F.3d at 1265. Consequently, Iacovelli and Dispoz–O's convictions cannot stand.

Dispoz–O also challenges as vouching a second portion of the government's closing, during which the prosecutor stated as follows:

> Common sense tells you people don't confess to a
> crime, they don't turn a completely innocent, legitimate
> business meeting into a crime, they don't confess to
> crimes they didn't commit and that's what the
> defendants are trying to tell you they did.
>
> Now obviously they got credit for their cooperation;
> that's the way it works. But that misses the point. Why
> would Liebmann and Atallah say they fixed prices at
> LaGuardia? Why would they tell that to the
> Government, why would they tell that to the judge who
> sentenced them? Why would they tell that to their
> customers, their customers, if it didn't happen? Think
> about that.

20

Dispoz-O objects to the first part of these remarks on the ground that the prosecutor expressly told the jury that Liebmann's and Atallah's convictions conclusively established the criminality of the LaGuardia meeting. The nature of these remarks was an appeal to the jury's common sense regarding the witnesses' credibility. Because the remarks were a request to the jury to view the evidence in the light most favorable to the prosecutor's case, they were not improper. Walker, 155 F.3d at 189.

Dispoz-O also contends that the prosecutor's reference to Liebmann's and Atallah's statements that they fixed prices at LaGuardia constituted vouching. However, a review of the record reveals that Liebmann and Atallah testified that they fixed prices at LaGuardia and that the defense challenged the truth of their testimony. Because the prosecutor's remark about fixing prices referred to evidence presented in the record, it does not constitute vouching. United States v. Dolasco, 470 F.2d 1297, 1299 (3d Cir. 1972).

III. CONCLUSION

For the foregoing reasons, we will reverse the judgment of the District Court and remand this case for a new trial for Iacovelli and Dispoz-O.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

21