

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-17-2007

# USA v. Wood

Precedential or Non-Precedential: Precedential

Docket No. 06-1372

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Wood" (2007). *2007 Decisions.* Paper 1029.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1029

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 06-1372

———————

UNITED STATES

v.

SHAHEED WOOD,

Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 04-00431)
Honorable J. Curtis Joyner, District Judge

———————

Argued March 16, 2007

BEFORE: FUENTES, GREENBERG and LOURIE*, Circuit Judges

(Filed: May 17, 2007)

———————

Mark S. Greenberg (argued)
LaCheen Dixon Wittels & Greenberg LLP
1429 Walnut Street, Suite 1301
Philadelphia, PA 19102

    Attorney  for Appellant

Patrick L. Meehan
United States Attorney
Jose R. Arteaga (argued)

_____

*Honorable Alan D. Lourie, United States Circuit Judge for the
Federal Circuit, sitting by designation.

Assistant U.S. Attorney
Robert A. Zauzmer
Assistant U.S. Attorney
Chief of Appeals
United States Attorney's Office
615 Chestnut Street
Philadelphia, PA 19106

    Attorneys for Appellee

—————

OPINION OF THE COURT

—————

GREENBERG, Circuit Judge.

## I. INTRODUCTION

A jury convicted Shaheed Wood of conspiracy to interfere with interstate commerce by robbery, in violation of 18 U.S.C. § 1951(a), interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2, and using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Based on these convictions, the district court sentenced Wood to a total custodial term of 240 months to be followed by five years of supervised release. The court entered a judgment reflecting this disposition on January 27, 2006. Wood appeals, asserting that the district court erred in denying his motion for a mistrial given what he contends were the prosecutor's improper statements in his closing argument to the jury. Wood further asserts that the district court erred in imposing a 6-level sentencing enhancement for his assault on a police officer pursuant to U.S.S.G. § 3A1.2(c). For the reasons we set forth below, we will affirm Wood's conviction but will vacate his sentence, and will remand the case to the district court for resentencing.

## II. FACTS AND PROCEDURAL HISTORY

After a jury has returned a guilty verdict we are bound to interpret the evidence in the light most favorable to the government.

United States v. Pungitore, 910 F.2d 1084, 1097 (3d Cir. 1990). With that premise in mind, we offer the following background facts which we note that, except for the identification of Wood as a fleeing robber, seem not to be in dispute.

On January 10, 2004, employees of the Pep Boys Automotive Store located at 4101 Market Street in West Philadelphia were preparing to close for the evening when several men wearing dark clothes, black gloves, and masks entered the premises and, at gunpoint, ordered the employees to get down on the floor. At the same time, unbeknownst to the robbers, Philadelphia police officers Martin Demota and Marquerite Wilcox, dressed in full uniform, were entering the parking lot adjacent to the Pep Boys service area in a marked police vehicle. As Demota exited his vehicle, he noticed a masked man in the store's service bay area and realized a robbery was taking place. Demota then heard someone from inside the store yell, "one time," a street slang term used to signal police presence.

As the robbers began to flee in various directions, Demota heard gunshots. He turned west at the corner onto Market Street, from which vantage point he observed a foot coming out of the front window of the store. Ultimately, Demota saw two men emerge from the store's front door, one thin and the other more heavyset.[1] Although Demota, who was yelling "stop, police," was unable to see either man's face, he observed the thinner individual take something from the heavyset one, at which point there was gunfire from one of the men. Demota, uninjured, returned gunfire and watched as the thinner man escaped, running west on Market Street and north on 42nd Street. The heavyset man was not as lucky. After falling to the ground, he got up and headed in the same direction as the thinner man. During the pursuit Demota lost sight of the heavyset man for approximately five seconds when, turning the corner of 42nd Street, he noticed an individual – later identified as Wood – approximately eight to ten feet in front of him. Wood fit the description of the heavyset man. Demota arrested Wood who falsely told him that he worked at Pep Boys.

On March 9, 2005, a grand jury in the Eastern District of Pennsylvania returned a three-count superseding indictment against

---

[1]It is undisputed that Demota was approximately 35 to 40 feet away from the suspects at this point and, because it was nighttime, streetlights aided him in his identification and pursuit efforts.

Wood[2] charging him with the offenses we listed above. The trial began on July 5, 2005. At the trial, the defense, in an effort to undermine Demota's identification of Wood as the heavyset man, focused on the circumstances surrounding the commission of the crime and Demota's identification of the fleeing robber. In particular, the defense cited the darkness; the distances from which Demota made his observations; Demota's inability to observe the faces of the suspects who fled from the store; Demota's "excited state-of-mind" after the fleeing men shot at him; and the time during which Demota lost sight of the suspects while pursuing them.

Not surprisingly, the prosecutor countered by citing evidence that tended to bolster Demota's identification. Among other things, the prosecutor pointed out that a surveillance video had captured the image of two armed men wearing masks and black clothing and Demota had testified that a large black jacket he recovered from Wood was similar to the one that one of the robbers in the videotape wore. Moreover, Demota identified Wood as the heavyset man from the videotape. There was additional support for the prosecutor's case, though perhaps not directly pointing to Wood, as items found at the crime scene and in the surrounding area included cartridge casings, two firearms, several live rounds of ammunition, black ski masks, a black knitted cap, black knitted gloves, loose coins, and a roll of duct tape.

There was also highly incriminating evidence pointing directly at Wood inasmuch as the police had found a gold 1997 Oldsmobile parked on a street adjacent to, but pointing away from, the Pep Boys that belonged to Wood's girlfriend Stacy Dawkins and for which Wood had the only set of keys. As it happens, Dawkins lent Wood her car the day of the robbery. Later that evening, officers recovered the following items from the car: a pink cleaning receipt with Wood's name on it; a holster; a black knitted skullcap; a black knitted hat; and the keys, which had been left in the ignition.

The parties, in their closing arguments, continued to address the identification issue. Again drawing attention to what he regarded as inconsistencies in Demota's testimony, Wood's attorney argued, among other things, that:

> [M]embers of the jury, just as Police Officer Demota

---

[2]The grand jury originally indicted Wood on July 27, 2004.

was mistaken about where he is located when he fired those shots under the pandemonium, the anguish going on at that time, he very well could have been mistaken as to what Mr. Wood might have said.

. . . .

I say to you, members of the jury, that no one saw Shaheed Wood drive that car to that location, that no one saw Mr. Wood get out of that car. We know that the car was held for fingerprints but that there were no fingerprints in that car that connected Mr. Wood at that date to that car. . . . [T]hat's why this corroborative evidence is important. And, that's why it is the lack of the evidence in this case that creates the reasonable doubt. I mean the Agent got up here and had the gumption to tell you that we didn't have to examine evidence because we had a case against this man. We didn't have to look – examine the evidence because we will wait for the guys to get caught before we examine the evidence. Well, that belies common sense. You know, members of the jury, how many people on death row have been let off with the discovery of DNA evidence that says that they are innocent? Surely, the cops in that case thought they had the right guy.

. . . .

This case, members of the jury boils down to the fact that the physical evidence that's taken from Mr. Wood is not consistent with his involvement in this robbery.

The distances from, testified to by Officer Demota are not consistent with what he said, that the attempt to put square pegs in a round hole by trying to pigeonhole this jacket to this photograph and the fact of the lack of the evidence that shows that the items that were to check[,] not to hold, but check for hairs and fibers and tests for DNA were not done and linked to him. That's what creates a reasonable doubt.

App. at 45, 50-52. Wood's attorney's reference to an agent testifying referred to an agent of the Federal Bureau of Investigation.

5

In response, the prosecutor began his closing argument with the following remarks:

> Was Officer Demota accurate about what Shaheed Wood said or mistaken about what you heard on the radio in the excitement[?]  You heard the officer's screams.  He was extremely agitated and excited and mistakes happen.  Of course, they can happen[.]

> You know why because that's how human nature is.  I can't explain it but that's what it is.  We all make mistakes.

> Government agents make mistakes, police officers make mistakes, citizens make mistakes, judges make mistakes, that's why we have courts of appeals.

Id. at 53.  Defense counsel objected to these remarks and moved for a mistrial, arguing the government's "particular juxtaposition of mistakes and courts of appeals may somehow lead this jury to believe that if they make a mistake in wrongly convicting Mr. Wood, that, somehow, the Court of Appeals can correct that mistake," thus "minimiz[ing] in the jury's mind the gravity of the responsibility to get it right."  Id. at 60-61.  The prosecutor answered defense counsel's contention by arguing that he was "merely emphasizing that making mistakes is part of human nature, and it is not limited to what an individual does in his line of work . . . . It is something that is common among human beings.  That's something that, in my view, all of these jurors know.  These jurors know that there are courts of appeals."  Id. at 61.  The district court denied the motion for a mistrial, pointing out that its "instructions to the jury will more than adequately direct them to their purpose in their deliberations and not that they're to make mistakes for somebody else to clean up, but that they're to consider the evidence and make a decision based on that evidence."[3]  Id. at 62.

Following the jury verdict, the district court sentenced Wood to concurrent 120-month custodial terms on Counts I and II of the superseding indictment.  The district court further sentenced Wood to

---

[3]The prosecutor, rather than the defense attorney, suggested to the court that it could cure any improprieties in his closing argument with a cautionary instruction.

a 120-month custodial term on Count III of the superseding indictment, but this sentence was to run consecutively to that imposed on Counts I and II. Wood's total incarceration reflected, in part, a 6-level upward adjustment under U.S.S.G. § 3A1.2(c) (2004) on the grounds that Wood's actions and/or those of his accomplices created a substantial risk of serious bodily injury to Demota. Wood now appeals, challenging both his conviction and his sentence.

## III. JURISDICTION

The district court exercised jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291, 3742(a).

## IV. DISCUSSION

### A. The Prosecutor's Closing Statements to the Jury

Wood argues first that the district court erred in denying his motion for a mistrial given statements made by the prosecutor during closing arguments. Specifically, Wood stresses that "[a] remark by the prosecutor in the course of his closing argument to the jury to the effect that if the jurors make a mistake in the verdict, some other tribunal will correct it, is improper as tending to influence them to shift the burden of their responsibility from themselves to an appellate court." Appellant's br. at 12 (internal citation omitted).

We review a district court's decision to deny a motion for mistrial predicated on the grounds that the prosecutor made improper remarks in a closing argument for abuse of discretion. United States v. Gambino, 926 F.2d 1355, 1365 (3d Cir. 1991). "To find that the court abused its discretion in failing to order a mistrial for prosecutorial misconduct, we must first be convinced that the prosecution did in fact misconduct itself." United States v. Rivas, 479 F.3d 259, 266 (3d Cir. 2007). Though, as we shall explain, the point is debatable, we are treating the prosecutor's comment as inappropriate and thus as misconduct.

Initially, we recognize that comments tending to lead a jury to

7

believe that the responsibility for determining the appropriateness of a defendant's sentence lies with an authority other than the jury are inappropriate. See Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S. Ct. 2633, 2639 (1985); Riley v. Tayor, 277 F.3d 261, 298 (3d Cir. 2001) (en banc). Even though arguments regarding the shifting of responsibility for the outcome in a criminal case appear to arise most often on appeals of sentences in capital cases, "state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court" similarly have no place in cases where a defendant may be sentenced to a punishment other than death. See Caldwell, 472 U.S. at 330, 105 S. Ct. at 2640. The reason for this rule is clear inasmuch as the jury should not regard itself as "advisory when it is not, or . . . be comforted by a belief that its decision will not have effect unless others make the same decision," because that approach would be "a frustration of the essence of the jury function." Riley, 277 F.3d at 297 (quoting Sawyer v. Butler, 881 F.2d 1273, 1282 (5th Cir. 1989) (internal quotation marks omitted)).

It is also important to consider that inasmuch as it may be difficult to glean from an appellate record those intangibles that a jury considers with respect to its determinations, it is essential that the "presumption of correctness" we attach to a verdict not be destroyed by comments from the prosecutor misstating the jury's role in the judicial process. See Caldwell, 472 U.S. at 330-31, 105 S. Ct. at 2640-41. Here, arguably the prosecutor's remarks that "[g]overnment agents make mistakes, police officers make mistakes, citizens make mistakes, judges make mistakes, that's why we have courts of appeals," app. at 53, were improper to the extent that they might have suggested to the jury that a court of appeals would correct any error on its part. Clearly, the principle that the prosecution should not attempt to defeat the jury's sense of responsibility, though usually set forth when juries make sentencing determinations, is applicable with respect to a jury's determination of whether or not the defendant is guilty.

Yet, that being said, it is by no means clear that the prosecutor's comment tended to deflect a sense of responsibility for its verdict from the jury. In this regard, we point out that the prosecutor's comment with respect to courts of appeals immediately followed his comment that judges make mistakes. This sequence makes it logical to believe that the jury would have understood the prosecutor's comment as relating to the functions of the trial judge and not the jury, an approach bolstered by the fact that the prosecutor

8

did not mention that juries make mistakes. Furthermore, the possible sting of this comment was reduced by the circumstance that the prosecutor's reference to "citizens [making] mistakes" following "[g]overnment agents" and "police officers" making mistakes, if related to the functioning of courts of appeals beyond reviewing actions of district judges, seems to refer to the actions of other persons as witnesses and not jurors. In this regard we point out that the prosecutor called an FBI agent, police officers, and civilians as witnesses. Thus, what the prosecutor said here was very different than the prosecutors' overreaching remarks in two cases on which Wood relies, Johnson v. Maryland, 601 A.2d 1093 (Md. 1992), and People v. Rutledge, 179 A.D.2d 404, 578 N.Y.S.2d 162 (N.Y. App. Div. 1992). Nevertheless, it would have been better if the prosecutor here had not made his borderline comment regarding courts of appeals and we will treat the remarks as being inappropriate.

Treating the prosecutor's remarks as inappropriate, the government invokes the "invited response" doctrine. But we find that the government's reliance on the invited response doctrine is not justified. The invited response doctrine protects comments made in "reasonable response to improper attacks by defense counsel." United States v. Walker, 155 F.3d 180, 186 n.5 (3d Cir. 1998) (internal quotations and citation omitted); see also United States v. Dispoz-O-Plastics, Inc., 172 F.3d 275, 284 (3d Cir. 1999). The premise underlying the doctrine's rationale is that "the unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial." Walker, 155 F.3d at 186 n.5 (internal quotations and citation omitted); see also Dispoz-O-Plastics, Inc., 172 F.3d at 284.

But though a prosecutor may use the doctrine defensively, he may not do so offensively. Dispoz-O-Plastics, Inc., 172 F.3d at 284-85 (noting the doctrine may not be used as a "springboard" to "launch[] affirmative attacks upon defendants") (internal quotation and citation omitted); United States v. Pelullo, 964 F.2d 193, 218 (3d Cir. 1992). Notably, "[w]e have generally found the invited response doctrine to be applicable only in instances where the prosecution team was attacked for reasons unsupported by the evidence at trial." Dispoz-O-Plastics, Inc., 172 F.3d at 285. For example, we have upheld use of the doctrine where the defense has asserted that the prosecutor suborned perjury, Gambino, 926 F.2d at 1364-66, and where the defense has made personal attacks on the integrity of prosecutors and law enforcement officers, Pungitore, 910 F.2d at

9

1126-27.

Here, the government protests that defense counsel "invited the jury to consider the results in unrelated cases in which defendants were exonerated after trial due to later review of DNA findings" and "clearly intended for the jury to decide to acquit based on uncertain[ty] caused by the results in different cases." Appellee's br. at 21. But the government's interpretation of defense counsel's remarks is unduly broad. Read in context, defense counsel merely was emphasizing the importance of gathering corroborative evidence at the outset of an investigation for purposes of determining whether a particular suspect is in fact responsible for a particular crime for, as we set forth above, he said:

> I say to you, members of the jury, that no one saw Shaheed Wood drive that car to that location, that no one saw Mr. Wood get out of that car. We know that the car was held for fingerprints but that there were no fingerprints in that car that connected Mr. Wood at that date to that car. . . . [T]hat's why this corroborative evidence is important. And, that's why it is the lack of the evidence in this case that creates the reasonable doubt. I mean the Agent got up here and had the gumption to tell you that we didn't have to examine evidence because we had a case against this man. We didn't have to look – examine the evidence because we will wait for the guys to get caught before we examine the evidence. Well, that belies common sense. You know, members of the jury, how many people on death row have been let off with the discovery of DNA evidence that says that they are innocent? Surely, the cops in that case thought they had the right guy.

App. at 50-51.

More pertinently for present purposes, there is no way in which we can view the defense attorney's comments as constituting an attack on the prosecutor's case predicated on arguments that are unsupported by the evidence at trial as, in fact, has happened in other cases. See Dispoz-O-Plastics, Inc., 172 F.3d at 284-86; Gambino, 926 F.2d at 1364-66; Pungitore, 910 F.2d at 1126-27. Accordingly, we find that treating the prosecutor's remarks as inappropriate, the invited response doctrine is not applicable in this case.

But notwithstanding the inapplicability of the invited response doctrine and treating the prosecutor's remark as improper, we still will not reverse for "[a] mistrial is not required where improper remarks were harmless, considering their scope, their relation to the context of the trial, the ameliorative effect of any curative instructions and the strength of the evidence supporting the conviction." Rivas, 479 F.3d at 267; see also United States v. Gambone, 314 F.3d 163, 179 (3d Cir. 2003); United States v. Zehrbach, 47 F.3d 1252, 1265 (3d Cir. 1995). Here, as the government points out, the challenged comment was only a single sentence in the prosecutor's entire closing argument, which continued at some length after he made his comment. Though it is true that the district court did not charge the jury with an expressly curative instruction, it did state to the jury that opening and closing statements made by counsel were not considered evidence, and that the jury must base its verdict on only the evidence presented.[4] Moreover, we have made an intensive review of the case and based on that review we are satisfied that there is convincing evidence, including, but not limited to Demota's testimony, supporting Wood's convictions on the charges listed in the indictment. In short, we are certain beyond any possible doubt that the prosecutor's comment

---

[4]Not only was the jury instructed not to treat counsel's summation as evidence, but it was specifically instructed to "carefully and impartially consider all of the evidence in the case, follow the law, as stated by the Court, and reach a true and just verdict." App. at 65. And, if the prosecution's remarks left any doubt about the jury's role, it was neutralized by this instruction:

> As jurors, your role is to resolve and decide the factual issues in this case.

> You are the sole and exclusive judges of the facts [,] you decide upon the weight of the evidence. You determine the credibility of witnesses. You resolve such conflicts as there may be in the evidence, and you draw such reasonable inferences as may be warranted by the testimony or exhibits in the case.

Id. If defense counsel believed this instruction was insufficient to prevent the jury from relying on the court of appeals, counsel had the opportunity to offer an instruction of his own. The government suggested that there could be a cautionary instruction but the defense did not seek it.

11

could not have affected the verdict and thus if there was an error in the district court, whether by the prosecutor or the court, it was harmless. There is simply no doubt that Wood is guilty. See Gambone, 314 F.3d at 177.

We close our section on the review of the trial aspect of the case with the following caution. In this case the prosecutor's comment did not lead to reversal. But we emphasize that reference in an argument to the review function of the courts of appeals may be dangerous territory into which a prosecutor should venture with care.

> B. Upward Adjustment for "Official Victim" under the Sentencing Guidelines

Wood argues second that the district court violated the ex post facto clause by applying a 6-level sentence enhancement pursuant to U.S.S.G. § 3A1.2(c).[5] Although Wood objected to the application of section 3A1.2(c), he did so on grounds other than the ex post facto clause and he does not raise those grounds on this appeal. Accordingly, our review of this alleged error is for plain error only.[6]

---

[5]Section 3A1.2(c) now provides in relevant part:

> If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable–

> (1) knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom . . .

> increase by 6 levels.

[6]Under the plain error standard, a reviewing court may reverse an order or judgment of the district court "only if [it] find[s] that (1) an error was committed; (2) the error was plain, that is, it is 'clear' and 'obvious;' and (3) the error 'affected [the defendant's] substantial rights.'" United States v. Nappi, 243 F.3d 758, 762 (3d Cir. 2001) (quoting United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777-78 (1993)). "If a forfeited error is plain and affect[s] substantial rights, a Court of Appeals has the authority to order correction, but is not required to do so." United States v. Stevens, 223 F.3d 239, 242 (3d Cir.

<u>See</u> Fed. R. Crim. P. 52(b); <u>United States v. Syme</u>, 276 F.3d 131, 158 (3d Cir. 2002).

The "official victim" enhancement relied on by the district court during Wood's January 5, 2006 sentencing was amended, effective November 1, 2004.  Wood, however, engaged in the conduct charged in the indictment on January 10, 2004, approximately 10 months before the amendment became effective.  Prior to the amendment, Wood would have been subject to a 3 rather than 6 level enhancement under the "official victim" guideline provision.[7]  <u>See</u> U.S.S.G. § 3A1.2(b) (2002).  We realize that, as a general rule, "sentencing courts must apply the guidelines in effect at the time of sentencing, not at the time of the crime."  <u>United States v. Kopp</u>, 951 F.2d 521, 526 (3d Cir. 1991), <u>superseded in part on other grounds as recognized by</u> <u>United States v. Corrado</u>, 53 F.3d 620 (3d Cir. 1995).  But where, as here, "such retroactivity results in harsher penalties, Ex Post Facto Clause problems arise, and courts must apply the earlier version."  <u>Id.</u>; <u>see also</u> U.S.S.G. § 1B1.11(b) ("If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the <u>ex post facto</u> clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.");  <u>United States v. Menon</u>, 24 F.3d 550, 566 (3d Cir. 1994) ("[C]hanges

_____

2000) (internal quotations and citation omitted).  Rather, the court should exercise its discretion "only if the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  <u>Id.</u> (internal quotations and citation omitted).  Defendants bear the burden of demonstrating that "plain error" occurred.  <u>Olano</u>, 507 U.S. at 734, 113 S. Ct. at 1778.

[7]Specifically, § 3A1.2(b) (2002) provided that:

If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable–

(1)     knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom . . .

increase by 3 levels.

13

in sentencing guidelines that enhance the penalty offend the Ex Post Facto Clause of Article I of the United States Constitution.").

In this case, the government concedes that all three prongs of plain error review have been met, i.e., that the district court erred in applying the 2004, rather than the 2002, "official victim" enhancement, the error was clear and obvious, and Wood's substantial rights were affected. See United States v. Knight, 266 F.3d 203, 207 (3d Cir. 2001) (holding that under plain error review "an error in application of the Guidelines that results in use of a higher sentencing range should be presumed to affect the defendant's substantial rights"). Accordingly, we will vacate Wood's sentence and remand the case to the district court with instructions to rely on the 2002, rather than the 2004, "official victim" enhancement for purposes of sentencing. Resentencing should be in accordance with 18 U.S.C. § 3553(a). See United States v. Cooper, 437 F.3d 324, 329 (3d Cir. 2006); see also United States v. Colon, 474 F.3d 95, 100 (3d Cir. 2007).

V. CONCLUSION

For the foregoing reasons, we will affirm Wood's judgment of conviction entered on January 27, 2006, but will vacate the sentence and will remand the case to the district court for the limited purpose of resentencing.

14