PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 19-2989

UNITED STATES OF AMERICA

v.

JEFFREY BOYD,

Appellant

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Action No. 4-18-cr-00281-001)
District Judge: Honorable Matthew W. Brann

Argued on September 23, 2020

Before: AMBRO, PORTER, and ROTH, <u>Circuit Judges</u>

(Opinion filed: May 28, 2021)

Heidi R. Freese
Frederick W. Ulrich **(Argued)**
Tammy L. Taylor
Office of Federal Public Defender
100 Chestnut Street
Suite 306
Harrisburg, PA 17101

        Counsel for Appellant

David J. Freed
Michelle L. Olshefski **(Argued)**
Office of United States Attorney
235 North Washington Avenue
P.O. Box 309, Suite 311
Scranton, PA 18503

        Counsel for Appellee

———————————

OPINION OF THE COURT

———————————

AMBRO, <u>Circuit Judge</u>

A state court in Oklahoma ordered Jeffrey Boyd to stay away from his ex-wife and his son, surrender his firearms, and undergo a mental health evaluation. After his arrest in Pennsylvania with a loaded handgun, a jury convicted Boyd of possessing a firearm while subject to a domestic violence protective order, in violation of 18 U.S.C. § 922(g)(8). He

appeals, contending (1) his trial was tainted by (a) improper jury instructions, (b) unduly prejudicial evidence, and (c) prosecutorial misconduct, and (2) the firearm prohibition violates his Second Amendment right of gun possession. We conclude that any trial errors were harmless and that Congress can constitutionally disarm those subject to certain protective orders, including Boyd. We thus affirm his conviction.

Just months after Boyd's trial, the Supreme Court issued *Rehaif v. United States*, 139 S. Ct. 2191 (2019), a decision on the proof required for a conviction under § 922(g). After *Rehaif*, the Government must show not only that a defendant was subject to a qualifying protective order at the time he possessed a gun, but also that he *knew* about the protective order. The District Court had not instructed the jury on this knowledge element, and Boyd now claims this error entitles him to a new trial. But we will not order a new trial when an error is harmless, and here the trial record contains overwhelming evidence of Boyd's knowledge, including his own admissions in a letter to the state court.

Next, Boyd argues the District Court erred by admitting into evidence statements that he made about harming then-President Trump's family. Given the limited scope of facts needed to prove a violation of § 922(g)(8), we are concerned by the decision to admit this clearly prejudicial evidence. Nonetheless, introduction of the statements did not contribute to the verdict, leaving any error harmless.

Third, Boyd points to repeated statements in the prosecution's closing argument that accused the defense of "misleading" the jury, hence alleging they amount to prosecutorial misconduct worthy of a mistrial. Without

3

opining on the appropriateness of these statements, we conclude that the context, jury instructions, and weight of the evidence make any error harmless.

Finally, Boyd contends § 922(g)(8) violates the Second Amendment as applied to him and others whose protective orders were issued without an explicit finding that they pose a credible threat to their intimate partners or their children. But we hold that Boyd has failed to distinguish himself from a class of presumptively dangerous persons who have historically been excluded from the Second Amendment's protections. And even if he could distinguish himself from this class, the Government's application of § 922(g)(8) would survive heightened scrutiny, as the statute is substantially related to the goal of reducing domestic violence, an indisputably important state interest. In upholding § 922(g)(8) against this as-applied constitutional challenge, we now join the other circuits to have considered the issue.

## I. Background

In October 2017, Connor Manley first began noticing symptoms of mental health issues in his father, Jeffrey Boyd. Boyd's appetite became nearly nonexistent, and he lost considerable weight. He experienced seizures, panic attacks, and bouts of paranoia, believing that people were carrying out experiments on him. In February 2018, Connor fled from his father's home.

4

One month later, Connor, Jennifer Manley (Boyd's ex-wife and Connor's mother),[1] and Eric Hatheway (Jennifer's new husband) each applied for and were granted *ex parte* protective orders in Oklahoma state court.[2] The information in the trial record surrounding the protective order is limited, as Boyd successfully petitioned the District Court to exclude any evidence of the events that spawned its entry. We know by Jennifer's admission that Boyd had never physically injured her, nor could she recall his ever threatening her with physical injury. Yet, based on his father's behavior and statements, Connor believed that Boyd "could strike out violently towards [his] mother . . . during an episode [of] psychosis" and posed a "moderate danger" to the general public. App. at 487. Jennifer knew that Boyd possessed firearms, which made obtaining a protective order that prohibited firearm possession of "[a]bsolute importance" to her. *Id.* at 283.

The Tulsa County Sheriff's Office personally served Boyd with the protective order. Two weeks later, an Oklahoma state judge held a hearing on whether the order should continue. According to the docket, the hearing took place, Boyd appeared, and the court took testimony. Both Jennifer and Connor recounted that Boyd had the opportunity to make his case to the judge. Jennifer recalled that Boyd unequivocally objected to everything in the order, and Connor recalled that his father characterized Connor's letter to the court as "the craziest thing he had ever read." App. at 296.

---

[1] We refer to these persons by their first names to avoid confusion because Jennifer and Connor share a last name.
[2] Each of the three protective orders was docketed separately. We generally cite only to Jennifer Manley's order and our references to a singular "order" refer to that order.

The judge then continued the order of protection until September 2018. It contained eleven prewritten terms, of which she checked three to apply as written, including a term prohibiting Boyd from having "any contact" with Jennifer and two other terms that prohibited him from:

> injuring, abusing, sexually assaulting, molesting, harassing, stalking, threatening, or otherwise interfering with [Jennifer,] and from use, attempted use or threatened use of physical force against [her] that would reasonably be expected to cause bodily injury [; and]
>
> engaging in other conduct that would place [her] in reasonable fear of bodily injury to [her or her] household members or relatives.

App. at 550. The judge also applied a fourth prewritten term to Boyd—that he "shall immediately surrender all firearms and other dangerous weapons within [his] possession or control and any concealed carry license," with the written-in modification that this surrender was to be to law enforcement. *Id.* at 551. Finally, in an open box, the judge applied two customized terms to Boyd. First, he was to stay 100 yards away from Jennifer. Second, in addition to these terms, which were also present in the earlier order served on him prior to the hearing, the judge ordered that Boyd undergo a mental health assessment and follow all recommendations. Finally, the order repeated a warning present in the earlier order: "Possession of a firearm or ammunition by a defendant while an order is in effect may subject the defendant to prosecution for a violation of federal law . . . ." *Id.* at 547, 552.

6

In July 2018, while the continued protective order was still in effect, Boyd drove from Oklahoma to Pennsylvania to meet with Kathryn Kelchner, a woman he followed on Twitter and had conversed with only a few times. Boyd showed up unexpectedly in Kelchner's driveway, and she met him for lunch the following day. Kelchner testified that at lunch Boyd stated that he was receiving messages from the CIA and hearing voices that told him to kill then-President Trump and three members of his family.

Kelchner recorded some of Boyd's statements and reported her encounter to the Pennsylvania State Police. Troopers searched for Boyd and found him sleeping in his parked truck. On waking him, they asked whether he had any weapons in the vehicle, and he replied that he had a gun. After speaking with Boyd further, the troopers took him into custody and searched the car, finding a loaded handgun and two additional magazines. Due to Boyd's threats against the then-President, the subsequent investigation was conducted jointly with the Secret Service.

Charges of terroristic threats under Pennsylvania law followed. Though those charges were dropped, a federal grand jury indicted Boyd on one count of possession of a firearm in violation of 18 U.S.C. § 922(g)(8), which makes it a crime for

> any person . . . who is subject to a court order that—
>
> > (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C)   (i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . .

to . . . possess in or affecting commerce, any firearm or ammunition . . . .

While in jail pending trial in federal court, Boyd wrote a letter to the Oklahoma state court judge to alert her that he would be missing his court date for the protective order. This letter was entered into evidence at the federal trial.

At trial, his counsel conceded that it was "essentially undisputed" that Boyd possessed a firearm in interstate commerce and that he was subject to a restraining order containing the provisions required by § 922(g)(8). App. at 199. He even suggested that Boyd "would be a misdemeanant in the State of Oklahoma" because he violated the order to surrender

8

his firearms. App. at 200, 361. Instead of challenging these elements, the counsel mounted a narrow defense that focused primarily on the "hearing" and "opportunity to participate" requirements of § 922(g)(8)(A). He stressed that there was no transcript of the hearing before the Oklahoma court and suggested that Connor and Jennifer's testimony about what went on at the hearing was biased. Boyd's counsel contrasted the continued protective order's statement that Boyd "has been *or will be* provided with reasonable notice and opportunity to be heard" with the "final" Oklahoma protective order's definitive statement that he "has been" provided with the same. *Compare* App. at 476 *with* App. at 480 (emphasis added). A further contention was that, although another hearing from the same day noted on the docket that an order was issued "without objection" from the defendant, the docket for Boyd was silent on whether he had an opportunity to object. *Compare* App. at 496 *with* App. at 502.

In line with this strategy, Boyd's proposed jury instructions included a requirement that he "knew that he was subject to a court order that . . . [w]as issued after a hearing of which [he] received actual notice, and at which [he] had an opportunity to participate." App. at 103. The District Court declined to include this instruction, and the jury found Boyd guilty of the one count charged. His sentence was time served, which amounted to just over one year of imprisonment, and three years of supervised release.

9

**II. Discussion**[3]

### A. The Failure to Include a *Rehaif* Jury Instruction

It is a felony for a person "knowingly" to violate § 922(g)(8); to do so is punishable by up to ten years in prison. 18 U.S.C. 924(a)(2). As Boyd acknowledges, the District Court was following established precedent when it interpreted this knowledge requirement to apply only to gun possession. *See, e.g.*, *United States v. Huet*, 665 F.3d 588, 596 (3d Cir. 2012). The Supreme Court subsequently held that, "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Rehaif*, 139 S. Ct. at 2200. The Government concedes that lack of a jury instruction stating that Boyd must *know* he was subject to a qualifying protective order was technically an error. But failing to include that element in the jury instruction was not a structural error that requires automatic reversal. *See United States v. Vazquez*, 271 F.3d 93, 103 (3d Cir. 2001) (en banc).

### 1. *The standard and scope of our review*

If a party timely objects to a missing jury instruction, we ask whether the omission was harmless, which here means we may not reverse if the Government shows "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

U.S. 1, 15 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); *Vazquez*, 271 F.3d at 103; Fed. R. Crim. P. 52(a). Otherwise, reversal is permitted, in our discretion, only if the error is plain and the defendant shows it affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 732–36 (1993); *Vazquez*, 271 F.3d at 99; Fed. R. Crim. P. 52(b).

To his credit, counsel for Boyd objected to the exclusion of the knowledge element. Was that missing element, though an error, harmless? The Supreme Court has upheld convictions on harmless error review, for example, where "the omitted element was uncontested and supported by overwhelming evidence." *Neder*, 527 U.S. at 17. We do not read "uncontested" literally to restrict harmless error to cases where the defendant made no attempt whatsoever to dispute the element, but rather more generally to mean the missing piece "is supported by uncontroverted evidence." *Id.* at 18.

The search for "overwhelming evidence" is not unlimited but confined to the trial record. *United States v. Nasir*, 982 F.3d 144, 170 (3d Cir. 2020) (en banc) (holding the same in the context of plain error review), *petition for cert. filed*, No. 20-1522 (Apr. 30, 2021); *id.* at 197 (Porter, J., concurring in part and dissenting in part) (noting that the substantial-rights portion of plain error review "is essentially harmless-error analysis, and as the majority itself acknowledges, all agree that it is based on the trial record").[4] Boyd further cites the Fourth Circuit's recent decision in *United States v. Medley*, 972 F.3d 399, 413 (4th Cir. 2020),

---

[4] Because there is overwhelming evidence in the trial record alone, our conclusion would be the same if we were permitted to consider the entire record.

11

*reh'g en banc granted*, 828 F. App'x 923 (4th Cir. 2020), which declined to evaluate a pre-*Rehaif* conviction based on the existing trial record because "it is inappropriate to speculate whether a defendant could have challenged the element that was not then at issue." *Id.* (citing *United States v. Brown*, 202 F.3d 691, 700 n.18 (4th Cir. 2000)).

*Medley*, however, does Boyd no favors. For in that case there "was not 'overwhelming evidence' of [the defendant's] knowledge of his prohibited status presented at trial and [he] did not contest this knowledge." *Id.* We are far afield here. Boyd claims that, "in [his] case, his knowledge of his status was hotly contested," and "[a]t his trial, [his] defense hinged on the argument that he did not 'know' that he was in the class of prohibited persons." Rule 28(j) letter, ECF No. 56; Boyd's Op. Br. at 16. And further, he proposed a *Rehaif*-style jury instruction. We need not speculate how Boyd would defend against a knowledge element, because by his own admission he actually mounted such a defense. *Cf. United States v. Kaspereit*, 994 F.3d 1202, 1208–09 (10th Cir. 2021) (rejecting an argument that failure to include a *Rehaif* instruction required a new trial where the omitted element was clearly at issue in the trial, stressing that "the government offered ample evidence that Defendant knew the order remained in place" and that the jury had necessarily made a finding on the defendant's knowledge by finding him guilty of making a false statement related to the protective order).

Accordingly, we can probe for "overwhelming evidence" in the trial record.

*2. Overwhelming record evidence establishes Boyd's knowledge.*

In general, the Government must show that a defendant knew he belonged to a category of persons described by § 922(g) at the time he possessed a firearm. *Rehaif*, 139 S. Ct. at 2200. Within the facts of *Rehaif*, this meant simply that Rehaif knew he was "illegally or unlawfully in the United States." *Id.* at 2194 (referring to § 922(g)(5)(A)). But not every class of § 922(g) is described so succinctly, and the Supreme Court was careful to note that it "express[ed] no view . . . about what precisely the Government must prove to establish a defendant's knowledge of status in respect to other § 922(g) provisions." *Id.* at 2200.

In the context of § 922(g)(8), the knowledge requirement is less straightforward. At a minimum, the Government must prove that Boyd knew he was subject to a protective order. But is there more? Must the Government further prove, for example, that he knew that his order explicitly prohibited the "use, attempted use, or threatened use of physical force"? *Cf. Rehaif*, 139 S. Ct. at 2207–08 (Alito, J. dissenting) (suggesting that § 922(g)(8) may require the Government to prove knowledge of no fewer than six different facts).

At the outset, we "doubt that the obligation to prove a defendant's knowledge of his status will be as burdensome" as some may suggest, even under the most restrictive possible formulations of the knowledge requirement. *Rehaif*, 139 S. Ct. at 2198. We agree with the Government that the same evidence that shows a defendant is *objectively* subject to a qualifying order will often also provide sufficient circumstantial evidence

13

to infer the defendant's *subjective knowledge* of his status. Gov't Br. at 22; *see Rehaif*, 139 S. Ct. at 2198 (citing to *Staples v. United States*, 511 U.S. 600, 615 n.11 (1994), to emphasize that "knowledge can be inferred from circumstantial evidence"). For example, personal service of an order that contains certain terms may alone be enough to infer that a defendant knew he was subject to an order containing those specific terms.[5] *See United States v. Baker*, 641 F.2d 1311, 1316 (9th Cir. 1981) (holding that personal service "may be desirable" in the contempt context, although it is not necessary if there is other evidence of knowledge). Nonetheless, we need not today grapple with all of the wrinkles that § 922(g)(8) may present because Boyd does not meaningfully dispute most aspects of his knowledge that conceivably could have been raised, and in any event all of them are supported by overwhelming record evidence.[6]

---

[5] We are particularly disinclined, for example, to allow a defendant to escape liability on a technicality by claiming that he skipped over a sentence while reading the order or didn't know the exact words it contained. *Cf. N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 634 (9th Cir. 1977) (concluding that "there was evidence [to] conclude that [the parties] had actual notice of the order's terms by virtue of their long-standing relation to the underlying controversy"); *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972) (holding that while an order may not be ambiguous, "this is not to say that where an injunction does give fair warning of the acts that it forbids, it can be avoided on merely technical grounds").

[6] Items of evidence included personal service of the *ex parte* order—a full two weeks before the state court hearing—that listed the terms required by § 922(g)(8) and set the time and

Boyd's limited argument, both at trial and on appeal, is that he did not know that he had an "opportunity to participate" at his hearing as required by § 922(g)(8)(A). On its face, this argument is plausible in light of *Rehaif*, which held that a defendant may rebut the knowledge requirement of § 922(g) by arguing a *bona fide* mistake of law, meaning that he "has a mistaken impression concerning the legal effect of some collateral matter." 139 S. Ct. at 2198 (quoting 1 W. LaFave & A. Scott, Substantive Criminal Law § 5.1(a), p. 575 (1986)). We need not decide whether a mistake-of-law defense is available in this context because, even if it were, we conclude that the Government has nonetheless provided overwhelming evidence to demonstrate Boyd's knowledge. *See Liparota v.*

---

place of the hearing. App. at 244–49, 544, 548. And any doubt is resolved by evidence that Boyd was actually aware of the order and its terms. A Secret Service agent testified that Boyd, during the agency's investigation, told him that Boyd's family had an order of protection against him. App. at 234. And further, Boyd's actions demonstrate knowledge of two terms in the order: (1) he apparently attempted to sidestep the "no contact" term by asking his sister to convey secret messages to Connor because he could not communicate with him directly, App. at 315, 571, 579, and (2) he acknowledged the protective order's mental health assessment term in a letter to the state court judge. App. at 491. It is illogical to believe Boyd lacked knowledge of terms #2 and #3 in the order (the § 922(g)(8) prohibitions) when he demonstrated his knowledge of terms #1 and #11 (the "no contact" and mental health provisions). Likewise, Boyd does not argue that he lacked knowledge that Jennifer, his ex-wife and the mother of his son, qualified as an "intimate partner," nor does he present any evidence that would disprove that reasonable inference.

*United States*, 471 U.S. 419, 434 (1985) (holding that the Government is not required to "introduce any extraordinary evidence that would conclusively demonstrate petitioner's state of mind . . . . [but rather] may prove [the defendant's knowledge] by reference to facts and circumstances surrounding the case").

The order that was served on Boyd prior to the Oklahoma hearing stated explicitly that he would be provided with an "opportunity to be heard." App. at 544. And the same evidence showing the court actually provided Boyd with an opportunity to participate also convinces us he knew he had that opportunity. Section 922(g)(8) does not require a final order or a particular hearing scope or duration, and "the plain text of the statute indicates that the 'opportunity to participate' requirement is a minimal one." *United States v. Young*, 458 F.3d 998, 1009 (9th Cir. 2006). Here it means that "a reasonable person in [Boyd's] position would have understood that he was permitted to interpose objections or make an argument as to why an order of protection should not be imposed." *United States v. Bramer*, 956 F.3d 91, 98 (2d Cir. 2020); *see also Kaspereit*, 994 F.3d at 1212 ("The government satisfies its burden if it presents legally sufficient evidence to show that a reasonable person would have understood the hearing as a chance to raise an objection, even if the defendant agrees to the order or does not otherwise object."); *United States v. Wilson*, 159 F.3d 280, 292 (7th Cir. 1998) (concluding that "[t]he terms 'hearing' and 'opportunity to participate' are not arcane legal terms that the general public does not understand"). Our sister circuits have found this low bar met when, for example, the defendant and the judge "engaged in a lengthy dialogue," *Young*, 458 F.3d at 1009, but have found it lacking when, for example, "[n]o evidence suggests that the

court engaged in any type of exchange with [the defendant]," *Bramer*, 956 F.3d at 98.

Both Jennifer and Connor testified that Boyd was present at the hearing, and they were able to hear him interact with the judge. App. at 282, 295–96. Jennifer recounted that Boyd unequivocally objected to everything in the orders and had follow-up conversations with the judge. App. at 282. Connor reported that his father disputed the allegations in Connor's letter to the court. App. at 296. Boyd presented no evidence to rebut their accounts of the hearing other than questioning their purported biases, and their accounts comport with the docket's notation that he was sworn in and testimony was taken. Indeed, in his letter to the state court judge Boyd acknowledged that he "appeared in [her] court for a hearing related to three emergency protective orders." App. at 524.[7]

In fact, the evidence in this case—including that Boyd's order required him to surrender his firearms and alerted him that keeping them may violate federal law—is so strong it could conceivably support a finding that Boyd knew he could not legally possess a firearm, a bar far higher than the Government's actual burden. *See Rehaif*, 139 S. Ct. at 2198

---

[7] We are not persuaded that Boyd's knowledge is negated merely because the hearing may have been short or by his comparisons to his final order and an unrelated hearing before the same court. *Cf. Sunderland v. Zimmerman,* 441 P.3d 179, 182–83 (Okla. Civ. App. 2019) (holding that, after a hearing, "the trial court has discretion to issue or continue an emergency temporary order" and that even though the continued order set a date for a "final" hearing, the parties had nonetheless already been provided a "full hearing").

(distinguishing a defendant who is unaware of his status as member of one of the classes set out in § 922(g) from one who is "unaware of the existence of a statute proscribing his conduct"); *Kaspereit*, 994 F.3d at 1208 (holding that "*Rehaif* does not require that Defendant knew his status prohibited his possession of a firearm, just that he knew of his status—in this case that he was subject to a protective order such as the one described in § 922(g)(8)"); *United States v. Maez*, 960 F.3d 949, 955 (7th Cir. 2020) (holding that "§ 922(g) requires knowledge only of status, not knowledge of the § 922(g) prohibition itself"); *United States v. Bowens*, 938 F.3d 790, 797 (6th Cir. 2019) (holding that such a broad reading of *Rehaif* "runs headlong into the venerable maxim that ignorance of the law is no excuse").

To us "the jury verdict would have been the same" even if the jurors were instructed to consider Boyd's knowledge that he was subject to a qualifying protective order, including that he had an opportunity to participate in the hearing. *Neder*, 527 U.S. at 17.

## B. Evidentiary Errors

The District Court rejected Boyd's attempt to exclude, under Rule of Evidence 404(b), evidence of the statements he made about killing the then-President or then-First Family members. We address *de novo* whether, as a matter of law, evidence falls within the scope of Rule 404(b), which provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1); *see United States v.*

18

*Cruz*, 326 F.3d 392, 394 (3d Cir. 2003).[8]  If the evidence could be admissible, we only review its admission for abuse of discretion.  *Cruz*, 326 F.3d at 394.  Even if that bar is met, this error can be harmless "when there is a 'high probability' that the discretionary error did not contribute to the verdict." *Langbord v. U.S. Dep't of the Treasury*, 832 F.3d 170, 196 (3d Cir. 2016) (en banc) (citation omitted).

Admitting this evidence, which is clearly prejudicial to Boyd and provides little-to-no value in proving the limited elements of § 922(g)(8), is arguably an error. *See United States v. Green*, 617 F.3d 233, 249–52 (3d Cir. 2010) (holding that even evidence that has some value in "complet[ing] the story of the crime" or "explain[ing] why [the defendant] was under investigation" must satisfy the requirements of Rule 403, which "permits a trial judge to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice." (internal quotation marks omitted)).  But we need not hold whether the District Court abused its discretion in admitting this evidence, for if there was an error we believe that it would be harmless.

As we explained in Section II.A, *supra*, this was not a difficult case to prove guilt.  The elements that the Government

---

[8] We note that this rule was revised between Boyd's trial and the filing of this opinion.  Relevant to us, "the word 'other' is restored to the location it held before restyling in 2011, to confirm that Rule 404(b) applies to crimes, wrongs and acts 'other' than those at issue in the case." Fed. R. Evid. 404(b)(1), advisory committee's note to 2020 amendment.  This revision, for which "[n]o substantive change [was] intended," *id.*, has no bearing on our analysis and conclusion on this issue.

needed to prove a § 922(g)(8) violation (gun possession while under a qualifying protective order and Boyd's knowledge of the same) were supported by "abundant evidence" in the record. *United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016) (concluding that the District Court had erred in admitting a substantially prejudicial video of a graphic murder, but that even this error was harmless in light of the strength of the evidence). The Government accordingly "was able to clearly and convincingly prove the elements of its case without reliance on the tainted evidence." *Langbord*, 832 F.3d at 196. Even a jury predisposed to find in Boyd's favor would struggle to find any way to escape the clear and overwhelming evidence of his guilt.

### C. Prosecutorial Misconduct

In its closing the Government argued that Boyd had attempted to "mislead" the jury by suggesting that the protective order hearing was *ex parte* (meaning with only one side present). App. at 358. And it did not do so in passing; counsel for the Government used the term "mislead" or "misleading" five times in her closing, as well as twice urging the jury not to be "misled." App. at 358–61, 369. Counsel for Boyd stated three times that he objected "as to misconduct," and once he simply objected without explanation. *Id*. The District Court overruled each objection. *Id*. On appeal, Boyd argues the prosecution's statements in closing amounted to misconduct and warrant a mistrial.

At the outset, we digress to a slight disagreement over our standard of review. The Government states the standard is abuse-of-discretion review over "a district court's decision to deny a motion for mistrial." Gov't's Br. at 4–5 (quoting *United*

20

*States v. Wood*, 486 F.3d 781, 786 (3d Cir. 2007)). By contrast, Boyd agrees with an abuse-of-discretion standard but suggests the review should be of "a contemporaneous objection" to the closing argument rather than a denial of a mistrial motion. Boyd's Op. Br. at 14 (citing *United States v. Berrios*, 676 F.3d 118, 134 (3d Cir. 2012)). The latter formulation better hits the mark here, as the District Court never ruled on an explicit request for a mistrial but it did overrule objections to misconduct.

Yet we would reach the same result no matter which standard of review applied, as either formulation of the standard incorporates a harmless-error component and, once again, no error affected the outcome. S*ee, e.g.*, *Wood*, 486 F.3d at 789 ("[W]e still will not reverse[,] for [a] mistrial is not required where improper remarks were harmless") (internal quotation marks omitted) (third alteration in original); *United States v. Lore*, 430 F.3d 190, 210 (3d Cir. 2005) (holding that "we review the district court's ruling on any contemporaneous objections for an abuse of discretion[,] . . . . [and if] an appellate court finds that there has been prosecutorial misconduct, it should reverse unless the error is harmless") (citations omitted).

Under harmless-error review we affirm if "it is highly probable that the error did not contribute to the judgment," which our *en banc* Court has held requires we have a "sure conviction that the error did not prejudice the defendant." *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc) (emphasis omitted).[9] To determine whether there

---

[9] Technically this is the standard for non-constitutional errors. Neither party argues for constitutional error, and our review

was prejudice, we consider "the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction." *Id*. As the Supreme Court has stated, and our Court sitting *en banc* has emphasized, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." *Id.* (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)).

Here, the prosecution's comments about the defense "misleading" the jury were related to the defense's argument that Boyd lacked knowledge he had a full and fair hearing in Oklahoma state court and his focus on an unrelated hearing before that same court. While we need not opine whether this defense theory was "misleading," it was certainly weak for the reasons we stated in Section II.A, *supra*. Even if the prosecution unfairly tainted the jury's perception of that

suggests that the purported attacks on defense counsel's honesty alleged here are analogous to situations where a prosecutor vouches for the credibility of a witness based on evidence outside of the record, which we have analyzed as non-constitutional. *See United States v. Rivas*, 493 F.3d 131, 139 (3d Cir. 2007) (noting that "the prohibition against personal attacks on attorneys is rooted less in a sense of decorum than in the same rule underlying the prohibition on vouching: one cannot make arguments unsupported by record evidence"); *United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 286 (3d Cir. 1999) ("[V]ouching that is aimed at the witness's credibility and is based on extra-record evidence is deemed non-constitutional error.").

theory, it would have little effect on the overall weakness of Boyd's case. And although this allegation was repeated multiple times, it made up only a small fraction of the prosecution's twenty-one-page closing argument. App. at 356–61. *Cf. Zehrbach*, 47 F.3d at 1267 (noting that "the comments at issue were but two sentences in a closing argument that filled forty pages of transcript").

On the other hand, the District Court overruled each of Boyd's objections and did not immediately issue any curative instructions to the jury. But, in its final instructions to the jury, the Court did make clear that several things "are not evidence," including "statements and arguments of the lawyers for the parties in this case," thus providing at least some saving effect for any errors. App. at 370. And the clincher, as we have stated repeatedly, is that the strength of the evidence supporting Boyd's conviction was overwhelming. Hence we are assured any error was harmless.

### D. The As-Applied Constitutional Challenge to § 922(g)(8)[10]

Over the past decade we have faced numerous as-applied challenges to § 922 generally, and § 922(g) specifically, though none before now to subsection (8). Each challenge we have analyzed under the two-part test set out in *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). *See, e.g.*, *Folajtar v. Att'y Gen.*, 980 F.3d 897, 901 (3d Cir. 2020); *Holloway v. Att'y Gen.*, 948 F.3d 164, 171 (3d Cir.

---

[10] As a constitutional challenge to the application of the statute, this is a question we review *de novo*. *United States v. Marzzarella*, 614 F.3d 85, 88 n.2 (3d Cir. 2010).

2020); *Binderup v. Att'y Gen.*, 836 F.3d 336, 346 (3d Cir. 2016) (en banc).  That framework applies with equal force here.

At Step One, Boyd bears the burden of showing that § 922(g)(8) "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," *Marzzarella*, 614 F.3d at 89, meaning that he must (i) "identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member," and then (ii) "present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Binderup*, 836 F.3d at 347 (citations omitted).  If he succeeds at Step One, then at Step Two the burden shifts to the Government to show that § 922(g)(8) satisfies a heightened scrutiny analysis. *Id.*

We note that both of our sister circuits to face as-applied challenges to § 922(g)(8) have held it to be constitutionally sound, though resting that conclusion on different grounds. *United States v. Reese*, 627 F.3d 792, 801–05 (10th Cir. 2010) (holding that § 922(g)(8) burdened the defendant's Second Amendment right at Step One but nonetheless that the law survived the heightened scrutiny analysis of Step Two); *United States v. Mahin*, 668 F.3d 119, 124 (4th Cir. 2012) (holding that § 922(g)(8) survives heightened scrutiny without addressing whether it burdens a Second Amendment right); *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012) (same).

We touch on both steps and hold that Boyd cannot distinguish himself from a class of presumptively dangerous persons who have been historically excluded from the Second

24

Amendment's protections. Thus his challenge fails at *Marzzarella* Step One. In the alternative, we also hold that even if Boyd could distinguish himself from the historically barred class, § 922(g)(8) survives under a heightened scrutiny analysis (Step Two).

   *1. Boyd cannot distinguish himself from a class of presumptively dangerous persons historically excluded from the Second Amendment's protections.*

   In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment provided an individual right to bear arms, at least for the core purpose of allowing "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635; *Folajtar*, 980 F.3d at 900. Yet that right "is not unlimited." *Heller*, 554 U.S. at 626. The Court identified several "presumptively lawful regulatory measures" that include "longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]" *Id.* at 626, 627 n.26; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (same). And it emphasized that these prohibitions, along with two others explicitly listed in *Heller* (and not relevant here), were merely "examples" rather than an exhaustive list, leaving future courts to flesh out the contours of the Second Amendment right. *Heller*, 554 U.S. at 626, 627 n.26.

   For felony convictions we have held that the Second Amendment does not protect those who have committed serious crimes. *Folajtar*, 980 F.3d at 902; *Binderup*, 836 F.3d at 349. Though we have declined to limit the reach of § 922(g)(1) to only those felons who were presumptively dangerous, *Folajtar*, 980 F.3d at 907, that baseline

25

determination no doubt suffices to remove a person from the scope of the Second Amendment's protections. *Id.* (observing that "dangerousness was one reason to restrict firearm possession"). The primal fear of dangerous persons with guns is backed by longstanding historical support "demonstrat[ing] that legislatures have the power to prohibit dangerous people from possessing guns," including "dangerous people who have not been convicted of felonies[.]" *Kanter v. Barr*, 919 F.3d 437, 451, 454 (7th Cir. 2019) (Barrett, J., dissenting); *see also Folajtar*, 980 F.3d at 911 (Bibas, J., dissenting); *Binderup*, 836 F.3d at 368 (Hardiman, J., concurring). These include persons who are mentally ill, as they potentially pose a "danger to themselves or to others." *Beers v. Attorney General*, 927 F.3d 150, 158 (3d Cir. 2019), *judgment vacated on other grounds, Beers v. Barr*, 140 S. Ct. 2758 (mem.) (2020); *see also Doe v. Governor of Pa.*, 977 F.3d 270, 274 (3d Cir. 2020) (reasoning that once a person has been involuntarily committed, "that person has joined the class of those historically without Second Amendment rights").[11] We have also considered danger to determine whether a person who commits a DUI falls within the Second Amendment's protections. *Holloway*, 948 F.3d at 172–77.

---

[11] For this reason, we also reject Boyd's argument that he is distinguishable from the historically barred class because the procedures connected with his protective order are comparatively less than for a criminal conviction. Boyd's Op. Br. at 30. The barred class is broader than convicted criminals, and clearly was meant to include some who were not convicted by a jury of their peers. The mentally ill, for example, do not undergo full-scale criminal trials, yet are excluded from firearm possession. *See generally Doe*, 977 F.3d 270; *Beers*, 927 F.3d 150.

We have not previously considered whether those who are subject to domestic violence protective orders covered by § 922(g)(8) fall within the historical bar of presumptively dangerous persons. The Eighth Circuit has and concluded that "this statute—like prohibitions on the possession of firearms by violent felons and the mentally ill—is focused on a threat presented by a specific category of presumptively dangerous individuals." *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011). We adopt that conclusion, which is based on scores of reports reinforcing the dangers of gun possession by domestic abusers. *See, e.g., United States v. Skoein*, 614 F.3d 638, 643–44 (7th Cir. 2010) (collecting myriad studies in a case involving a domestic violence conviction under § 922(g)(9)); *Reese*, 627 F.3d at 802–03 (citing approvingly these same studies in the context of § 922(g)(8)).

That said, the Eighth Circuit's reasoning does not apply squarely to this case. *Bena* dealt with a facial challenge to § 922(g)(8), arguing that on its face no circumstances exist under which the provision would be valid as written. 664 F.3d at 1182 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). It expressly declined to determine whether the statute would be constitutional "as applied to a person who is subject to an order that was entered without evidence of dangerousness." *Id.* at 1185. Boyd, whose order does not contain an explicit finding of dangerousness, thus argues the statute is unconstitutional *as applied to him*.

In attempting to distinguish himself from the historically barred class, Boyd emphasizes that in Oklahoma protective orders do not require a finding that a person poses a credible threat to another's safety, but rather a court "may

27

impose any terms and conditions . . . that [it] reasonably believes are necessary to bring about the cessation of domestic abuse . . . *or harassment*." 22 Okl. St. Ann. § 60.4.C.1 (emphasis added); *see also* 22 Okl. St. Ann. § 60.3.A (authorizing issuance of emergency *ex parte* orders "necessary to protect the victim from immediate and present danger of domestic abuse, stalking, or harassment"). We hesitate to place such a formalistic requirement on the many state courts across the country that operate under myriad procedures, and we will not be so obtuse as to assume a court lacked credible concerns about a defendant's dangerousness merely because it does not say so expressly. *See United States v. Emerson*, 270 F.3d 203, 263 (5th Cir. 2001) ("[W]e cannot say that section 922(g)(8)(C)(ii)'s lack of a requirement for an explicit, express credible threat finding by the court issuing the order . . . renders that section infirm under the Second Amendment[,] . . . . [as] such findings can be as much 'boilerplate' or in error as any other part of such an order."); *see also Sunuwar v. Att'y Gen.*, 989 F.3d 239, 248 (3d Cir. 2021) (concluding in the context of an immigration case that "the no-contact provisions of a protection order inherently involve protection against credible threats of violence, repeated harassment, or bodily injury" because "the primary purpose of a no-contact order is to protect the victims of domestic abuse by the offender" (internal citations and quotation marks omitted)).

Here, for example, a state judge, after a hearing at which Boyd participated, chose to continue the protective order against him and found it necessary to order him to surrender his firearms and undergo a mental health evaluation,[12] plus she

---

[12] We note in passing that Boyd's attempt to distinguish himself from the historically barred class may further be

28

included a term that prohibited Boyd "from injuring, abusing, sexually assaulting, molesting, harassing, stalking, threatening, or otherwise interfering with [Jennifer,] and from use, attempted use or threatened use of physical force against [her]." App. at 550. If the state court believed that Boyd posed only a risk of harassment untethered from dangerousness, it could have issued no order at all, it could have issued only a "no contact" order, or it could have modified the above term to strike out the physical injury component and leave in only the directive with respect to harassment. It instead issued the type of order we would expect when faced with a person who posed a credible danger to his family.[13]

Given this context, we conclude that Boyd cannot distinguish himself from the class of presumptively dangerous persons who historically lack Second Amendment protections.

---

vulnerable on mental health grounds as a person who was disarmed by a state court after a hearing and pending a further mental health evaluation. *See generally Doe*, 977 F.3d 270; *Beers*, 927 F.3d 150. But because the parties did not raise this line of argument before us, and because we can affirm without considering it, we do not rely on it in reaching our decision.

[13] We note, as further support that Boyd cannot distinguish himself from a class of presumptively dangerous persons, that Connor believed Boyd "could strike out violently towards [his] mother and her husband during an episode [of] psychosis" and posed a "moderate danger" to the general public. App. at 487.

29

*2. In any event, § 922(g)(8) survives a heightened scrutiny analysis.*

Even if Boyd could distinguish himself from the historically barred class, we hold that § 922(g)(8) survives heightened scrutiny, meaning review for more than whether a statute bears a rational connection to a legitimate state interest. Two types of heightened scrutiny apply: strict and intermediate. In determining whether a law is unconstitutional, laws that "severely burden" the "core" right of "law-abiding, responsible citizens to use arms in defense of hearth and home" are subject to strict scrutiny, *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen.*, 910 F.3d 106, 115, 117 (3d Cir. 2018) (quoting *Heller*, 554 U.S. at 628–30, 635), meaning that they must be "narrowly tailored to promote a compelling Government interest," *Drake v. Filco*, 724 F.3d 426, 436 (3d Cir. 2013). Otherwise, intermediate scrutiny applies, meaning that the law must be "substantially related" or have a "substantial fit" with an important governmental interest. *Binderup*, 836 at 341, 356.[14]

Here, we conclude that intermediate scrutiny applies, because those subject to a protective order of the type described by § 922(g)(8) fall outside the core group of "law-abiding, responsible citizens" that are most strongly protected by the Second Amendment. *See United States v. McGinnis*, 956 F.3d

---

[14] We have sometimes alternatively characterized intermediate scrutiny as requiring a "reasonable fit" between the restriction and the important state interest. *See N.J. Rifle*, 910 F.3d at 119 (citing *Drake*, 724 F.3d at 436; *Marzzarella*, 614 F.3d at 98). We use "substantial fit" here to follow the language used in our *en banc* decision in *Binderup*.

747, 757 (5th Cir. 2020). And even if those subject to protective orders were considered "responsible citizens," we are further reassured that the burden imposed by § 922(g)(8) is not "severe" because the law "applies only to a narrow class of persons, rather than to the public at large," *Reese*, 627 F.3d at 802, and only for the discrete period of the protective order. *See McGinnis*, 956 F.3d at 757.

The Government argues the relevant important interest is "reducing domestic violence," Gov't's Br. at 63, a claim not seriously in dispute (indeed, Boyd does not waste even a single word in his briefs contesting this point). *See, e.g.*, *United States v. Castleman*, 572 U.S. 157, 159–60 (2014) (observing that the "country witnesses more than a million acts of domestic violence, and hundreds of deaths from domestic violence, each year"); Antonia C. Novello et al., *From the Surgeon General, U.S. Public Health Service: A Medical Response to Domestic Violence*, 267 JAMA 3132 (1992) (concluding that "[d]omestic violence may touch as many as one fourth of all American families"), *cited in* H.R. Rep. No. 103–395, at 25 (1993).

Boyd does dispute, however, the application of intermediate scrutiny on the ground that there is no substantial fit between the protective order prohibition and the objective of reducing domestic violence. But Congress's careful tailoring, which carefully removes from the ambit of the statute those who are least likely to pose a danger of domestic violence, undermines this contention. The law protects against sweeping in persons captured by meritless orders based on false accusations that can easily be rebutted at a hearing. It applies only to orders issued to protect intimate partners or children, and only after a court has found it appropriate to enter

31

an order that explicitly prohibits the use, attempted use, or threatened use of physical force against them.  That is what occurred here.

As further reinforcement, we note extensive evidence supporting links between firearms and domestic violence on the one hand, and protective orders and domestic violence on the other.  *See Skoein*, 614 F.3d at 643–44; *Reese*, 627 F.3d at 802–03; *see also* Matthew R. Durose et al., *Family Violence Statistics*, U.S. Dep't of Just. Bureau of Just. Stat. 64 (2005) (finding that nearly half of inmates convicted of family violence and over two-thirds of those convicted of a violent crime against their spouse were subject to a restraining order at some time in their lives); Oklahoma Domestic Violence Fatality Review Board, *Domestic Violence Homicide in Oklahoma* 8 (2012) (finding, in the state that issued Boyd's protective order, that there was a protective order used in nearly one quarter of all intimate partner homicides in 2011). For an important state interest that may touch one in four American families, it is hard to argue that a restriction temporarily limiting the gun rights of only one in hundreds of adults is impermissibly overbroad.[15]

---

[15] A back-of-the-envelope conservative estimate suggests that at any given time about one in every 100 adults may be subject to a state protective order of some kind.  *See* Becki R. Goggins & Dennis A. DeBacco, *Survey of State Criminal History Information Systems, 2018*, at t.3 (Nov. 2020), https://www.ojp.gov/pdffiles1/bjs/grants/255651.pdf (a Department-of-Justice-funded study reporting 2.2 million protection orders in databases for 38 states and the District of Columbia); U.S. Census Bureau, American Community Survey Demographic and Housing Estimates t.K200104

\* \* \* \* \*

Congress has chosen to address the searing issue of domestic violence by disarming persons when a court has found it necessary to issue a protective order that requires them not to harm their intimate partners or their children. And Congress has chosen to do so only after that person has had notice and a hearing before a court. That limitation on gun rights is clearly within the bounds of restrictions that the Second Amendment contemplates.

Boyd nonetheless contends that his prosecution in particular was tainted by multiple errors. Based on the strength of the evidence presented at trial, however, we are convinced that any reasonable jury would have convicted him even absent all purported errors. Overwhelming evidence shows that Boyd knew he was subject to a qualifying protective order when he

---

(reporting an estimated population of 218.5 million adults in those 38 states and the District of Columbia in 2018). The true number is probably smaller given that, as in Boyd's case, there may be multiple protective orders issued against the same person. And the subset of protective orders captured by § 922(g)(8) likely is substantially smaller still. *Cf.* Becki Goggins & Anne Gallegos, Nat'l Ctr. For St. Cts., *State Progress in Record Reporting for Firearm-Related Background Checks: Protection Order Submissions* at 9–10 (Apr. 2016), https://www.ojp.gov/pdffiles1/bjs/grants/249864. pdf (noting that in New York, for example, only about 39% of the orders the state reported to a particular federal index "were federally disqualifying protection orders" when considering "Section 922(g) (8) of the Brady Act").

carried a loaded firearm across state lines.  That is all that § 922(g)(8) requires.  We thus affirm.